IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 29, 2020

## STATE OF TENNESSEE v. EDWIN EAKER

**Appeal from the Criminal Court for Knox County
No. 113569    Bobby R. McGee, Judge**

_____

### No. E2019-02246-CCA-R3-CD

_____

The Defendant, Edwin Eaker, was convicted by a Knox County Criminal Court jury of four counts of aggravated burglary, a Class C felony. *See* T.C.A. § 39-14-403 (2018). The trial court merged two convictions involving an April 13, 2018 home burglary and two convictions involving an April 10, 2018 home burglary, and the court sentenced the Defendant to serve fifteen years for each conviction as a career offender. The court imposed the sentences consecutively, for an effective sentence of thirty years. On appeal, the Defendant contends that the evidence is insufficient to support his convictions. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Joseph Liddell Kirk (on appeal) and Alexander Brown (at trial), Knoxville, Tennessee, for the Appellant, Edwin Eaker.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

At the trial, James Thomas testified that he was at home on April 13, 2018, discussing the day's work schedule with two of his three sons, Ryan and Blake.[1] Mr. Thomas said that Ryan's house was within sight of his house and that he saw a car at Ryan's

_____

[1] Because James, Ryan, and Blake Thomas share the same surname, we will refer to James Thomas as Mr. Thomas and to Ryan and Blake by their first names.

house. Mr. Thomas said that he and Ryan went to Ryan's house in Mr. Thomas's SUV and that he parked in a manner which blocked the car. He said that the car's door was open and its engine was running and that he turned off the car and placed the key in the seat. Mr. Thomas said he called 9-1-1. Mr. Thomas said that Ryan went to the back porch and "mouthed" to Mr. Thomas that the back door had been kicked in. Mr. Thomas said Blake arrived in a truck and went to the front of the house.

Mr. Thomas testified that a man ran from the front door holding a jewelry box and that the man said, "[Y]ou've got me," and "I've never done this." Mr. Thomas identified the Defendant as the man he saw on April 13, 2018. Mr. Thomas said that, at some point, the Defendant stated that he "didn't want to go back." Mr. Thomas said that the Defendant placed the jewelry box on the hood of Mr. Thomas's work truck, that the Defendant "was running around," that the Defendant demanded the return of his keys, and that Blake threw the Defendant's keys into the yard. Mr. Thomas said both Blake and Ryan were armed and agreed he told his sons not to shoot the Defendant. Mr. Thomas's 9-1-1 call was played for the jury. Mr. Thomas identified photographs taken at the scene, which were received as exhibits. He identified a photograph taken by Blake of the Defendant "running down the road."

Mr. Thomas testified that the police arrived and arrested the Defendant, who was in a field. Mr. Thomas said that the officers asked if coins in the Defendant's car belonged to Ryan but that the coins were not Ryan's. Mr. Thomas said that the police asked if they had seen anyone other than the Defendant and that the police checked to be sure no one else was inside Ryan's house.

Blake Thomas testified that he was at his father's house on April 13, 2018, and that his father looked out the kitchen window and asked his brother, Ryan, if anyone was supposed to be at Ryan's house. Blake said Ryan and Mr. Thomas drove to Ryan's house and that Blake followed later in another vehicle.

Blake Thomas testified that Ryan told him the back door had been kicked in. Blake said that he went to the front of the house and that Ryan went to the back. Blake said that as he was about to open the front door, a man who held a jewelry box stepped out onto the stoop. Blake said the man apologized, said he "didn't mean to do this," and said he had "never done this before." Blake identified the man as the Defendant.

Blake Thomas testified that the Defendant saw Ryan with his gun drawn and that the Defendant noticed Blake held a gun behind his back. Blake said the Defendant tried to hand the jewelry box to him and then to Ryan. Blake said that after he and Ryan refused to take the jewelry box, the Defendant placed it on the work truck and tried to run to the driver's side of the Defendant's car. Blake said that he jumped across the car's hood, that he placed the Defendant's car key in Blake's pocket, and that the Defendant became upset.

-2-

Blake said the Defendant stated that he needed to leave and that they could not hold him there. Blake said that the Defendant came toward him, that Blake threw the Defendant's keys behind Ryan, that the Defendant went toward Ryan, and that Ryan raised his gun and pointed it at the Defendant.

Blake Thomas testified that the Defendant ran through the yard to an intersection, where the Defendant stayed for a few minutes before returning to retrieve the keys. Blake said he had picked up the keys and put them in his pocket by the time the Defendant returned. Blake said that the Defendant claimed he was being imprisoned and that the Defendant retrieved his cell phone from his car. Blake said they told the Defendant that he could leave but that he could not drive away in the car and that the police were on the way. Blake said the Defendant went back to the intersection and was detained by officers when they arrived.

Blake Thomas testified that he took photographs of the Defendant running down the road. The photographs were received as exhibits.

Ryan Thomas testified that he was at his father's house on April 13, 2018. Ryan said that his house was nearby and that his wife had a jewelry box which she kept in the master bedroom. He said that while he was at his father's house, Mr. Thomas asked if someone was supposed to be at Ryan's house. Ryan said that he did not recognize the car he saw at his house and that he and Mr. Thomas went to Ryan's house. Ryan said Mr. Thomas parked to block the suspicious car from being driven away. Ryan said that the car's engine was running and that Mr. Thomas turned off the ignition and removed the key. Ryan said Mr. Thomas called 9-1-1. Ryan said Blake arrived and helped block the car's exit with the work truck.

Ryan Thomas testified that he went to the back of his house, heard voices at the front, and saw the Defendant come around the corner of the house. Ryan said the Defendant wore gloves and held a jewelry box. Ryan said that he told the Defendant to stop, that Ryan had his gun "on" the Defendant, and that the Defendant continued walking toward him. Ryan said that he backed away, that the Defendant continued toward him, and that the Defendant tried to hand him the jewelry box. Ryan said that when he did not take the jewelry box, the Defendant placed it on the hood of the work truck and ran into a field. Ryan said that the Defendant came back toward the house and that the Defendant said he "had never done anything like this before and that he had a little girl." Ryan said the Defendant ran down the road. Ryan said the Defendant returned a second time and told them they were holding him against his will. Ryan said that the Defendant was "a little mad and belligerent," that the Defendant wanted his keys, and that the Defendant "kept kind of running around." Ryan said the Defendant tried to go to the driver's side of the Defendant's car but that Ryan blocked him. Ryan said the Defendant went to the passenger's side, grabbed a jacket and a cell phone, and ran through a field. Ryan said that

-3-

he could see the Defendant and that they pointed out the Defendant to the officers who arrived. Ryan said that his wife arrived and that they went through the house with an officer. Ryan said the master bedroom was the only place that had been disturbed. He said a handgun safe had been moved to the floor.

Ryan Thomas testified that he had not given the Defendant permission to enter his home or to take his property. Ryan said he did not know the Defendant. Ryan identified photographs of his home, which were received as exhibits. They depicted the broken back doorframe and disarray in the bedroom that had not existed when he and his wife left earlier that morning.

Knox County Sheriff's Detective Frederick Woodrow Martin, Jr., testified that he investigated the April 13, 2018 burglary at Ryan Thomas's house. Detective Martin identified photographs of a car he searched at the scene. The photographs were received as exhibits. He said he found coins and watches in the car's cupholder. Detective Martin said he and Detective Richard Van Kirk interviewed the Defendant at the Sheriff Department office.

Detective Richard Van Kirk testified that he investigated an April 11, 2018 burglary at the Smith home. He said he met with Mr. Smith, who showed him around the house and told him that items taken included a blood pressure cuff, coins, and a jewelry box. He said he searched a pawn shop database, Facebook Marketplace, and some cell phone applications in an effort to find the stolen items.

Detective Van Kirk testified that he was present for the Defendant's April 13, 2018 interview. He said the Defendant waived his *Miranda* rights. Detective Van Kirk said he did not ask the Defendant about the April 11 Smith burglary during the interview. A portion of the interview was played for the jury. In it, the Defendant denied that he had kicked in Ryan Thomas's door. The Defendant said someone else had already been in the house. The Defendant said no one else had been in the house with him.

Detective Van Kirk testified that after the interview, he and Detective Martin took the Defendant to their office. Detective Van Kirk said he noticed gold coins on a table where the detectives kept stolen property recovered as evidence, which reminded him of the burglary at the Smith home. He said he called Ms. Smith and learned that a coin stolen from her home was dated 1979, which was the same date as a coin on the property table. Detective Van Kirk said that he asked the Defendant if the Defendant had burglarized another house and that the Defendant admitted he burglarized the Smith house and took a jewelry box.

Detective Van Kirk identified a photograph of a car and said he had received an email or text message from Mr. Smith which contained the photograph and stated that the

car was associated with the person who had "been in the area breaking into things." Detective Van Kirk identified the car in the photograph as belonging to the Defendant.

Detective Van Kirk identified the following coins: a half dollar, a Sacagawea coin, and a gold coin. The coins were received as exhibits. Detective Van Kirk did not know that one of the coins was a Susan B. Anthony coin and that all Susan B. Anthony coins were minted between 1979 and 1981.

Ann Smith testified that she kept a jewelry box in the bedroom of her home. She said the jewelry box contained coins, jewelry, memorabilia, and gift cards. She said the gift cards were as follows: Starbucks, $25; iTunes, $25; and Bojangles, free biscuit.

Ms. Smith testified that she and her husband left home at 6:00 p.m. on April 10, 2018, and that they were gone for one hour and fifty minutes. She said that when they returned, their gate and back door were open. She said the window next to the back door had been broken. She said that they called 9-1-1 and that they entered the house once the police arrived. She said that two dogs were locked in the kitchen and that two other dogs were "loose." She said that her jewelry box, several boxes containing jewelry, her pillowcase, and $80 cash were taken. She said the cash had been in her wallet, which she found thrown on the bed.

Ms. Smith testified that she and her sister had divided her mother's coin collection after her mother's death. Ms. Smith said that after she spoke with Detective Van Kirk, she had her sister email photographs of coins that her sister had. Ms. Smith said she provided the photographs to Detective Van Kirk. Ms. Smith identified a Susan B. Anthony dollar coin dated 1979 in a photograph she had provided to Detective Van Kirk. She identified a Sacagawea coin in a photograph, which was like one she had. She identified a coin depicting President Madison in a photograph as being different from a coin she had, stating that her coin depicted President Garfield. The photographs of the Susan B. Anthony and Sacagawea coins were received as exhibits. Ms. Smith identified photographs of her house, which were received as exhibits.

Ms. Smith testified that she received the Sacagawea coin, four Susan B. Anthony coins, the President Garfield coin, the iTunes gift card, and the Bojangles gift card from Detective Van Kirk. She said she did not know the Defendant and had not given him permission to enter her home or to take her property. She acknowledged that she did not have her name on the iTunes gift card and that she had not told Detective Van Kirk initially about the Bojangles card because she had not purchased it.

The Defendant testified that, at the time of his arrest, he had been on parole and had been employed as a concrete cutting laborer. He said he had prior aggravated burglary and theft convictions. He agreed that he had committed nine aggravated burglaries while on

probation for aggravated burglary. He said he had been "on pills real bad" before his daughter's birth. He said he "took all the charges" in order to keep the mother of his daughter from being charged and losing custody of their daughter. He said he served over four and one-half years in prison. He said he completed therapy and courses in prison, that he had work-release jobs, that he was involved in prison ministry, and that he worked to improve himself. He said that he "picked up [his] child" and obtained employment as soon as he was released from prison. He said he paid court costs and fines and paid to have his driver's license reinstated. He said he was paid $12 per hour once his license was reinstated and that he worked fifty to seventy hours per week.

Relative to the charge related to Ryan Thomas's house, the Defendant testified that he wanted to supplement his income and had agreed to meet a person he knew as "Scrap" to buy scrap metal, which the Defendant planned to resell. The Defendant did not know Scrap's given name. The Defendant said he went inside Ryan's house, bought the jewelry box from Scrap for $100, and left the house. The Defendant said he thought Scrap owned the house. The Defendant disagreed with the State's proof that Ryan met him at the front door and said he did not see anyone until he reached the edge of a concrete walkway. He said that he did not try to give anyone the jewelry box and that he had placed it on the concrete. He denied that he had kicked in the door. He said he had been terrified when he "had two guns in [his]face" and that Mr. Thomas had yelled for his sons not to shoot the Defendant. He acknowledged that he said initially that he had been alone and that he did not know where Scrap went.

The Defendant testified that one of the Thomas brothers threw his keys into the yard when the Defendant tried to get into his car to leave. The Defendant said he asked for his keys. The Defendant said he told the Thomases and the police that he had not kicked in the door. When asked if he had said, "I'm sorry," to Ryan, the Defendant stated that he had said he was sorry the house had been broken into and that the Defendant had not been the person who did it. The Defendant said he told the Thomases he "got taken" and had been trying to make extra money for his daughter. He acknowledged he had said, "I've never done this before," in reference to his having never bought scrap gold.

The Defendant testified that he had four gold coins and eight silver dollar coins. He said four of the silver dollar coins were Susan B. Anthony coins. He said one of the coins "had a guy on the face of it." He said he had owned the coins since before he was imprisoned. He said he began buying them before his daughter's birth because he expected they would become valuable. He said that once he learned they were not valuable, he and his daughter's mother began spending them.

The Defendant testified that he had an iTunes gift card that he bought at Brittany Goins's request. He said he had the Bojangles free biscuit card because his mother-in-law worked there and had given it to him.

The Defendant testified that he had not wanted to implicate Scrap in the police interview. The Defendant acknowledged that he decided to lie to the police. The Defendant said he told the police that he had gone to the house and that he did not kick in the door. He said he told Detective Martin that "the door was already kicked [in]" because Ryan had pointed a gun at his face and said, "[Y]ou kicked my door in." The Defendant said he told Detective Martin that he went to the back door, rather than the front door, because he "couldn't produce Scrap." The Defendant said he told Detective Martin that he took jewelry boxes from houses because he had taken jewelry boxes in the previous burglaries for which he had convictions.

The Defendant testified that he had never been to the Smiths' house. He said Detective Van Kirk "bold-faced lied" about the Defendant's having admitted that he broke into the Smiths' house and took a jewelry box. He denied that a car depicted in a photograph exhibit was his. He said the watches that were recovered from the car were his.

The Defendant testified that it was not cold on April 13, 2018. He said he had gloves in his pocket because he had moved a refrigerator earlier that morning.

Detective Van Kirk testified on rebuttal that the Defendant admitted breaking into the Smiths' house and stealing a jewelry box.

Ms. Smith was recalled and testified that she was sure the coins the police recovered were hers.

Blake Thomas was recalled and testified that the Defendant had worn purple latex gloves when the Defendant came out of Ryan Thomas's house. Blake said that the Defendant tried to give the jewelry box to him and to Ryan, that neither took it, and that the Defendant placed the jewelry box on the hood of a truck. Blake said the Defendant did not place the jewelry box on the concrete.

The jury found the Defendant guilty of two counts of aggravated burglary of the Smith house and two counts of aggravated burglary of the Thomas house. The trial court merged the convictions as to each residence. After the court imposed the effective thirty-year sentence, this appeal followed.

The Defendant contends that the evidence is insufficient to support his convictions. In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521

(Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"Aggravated burglary is burglary of a habitation[.]" T.C.A. § 39-14-403(a). As relevant to this appeal, "A person commits burglary who, without the effective consent of the property owner . . . [e]nters a building and commits or attempts to commit a felony, theft or assault[.]" *Id.* § 39-14-402(a)(3) (2018).

The evidence reflects that the Defendant forced his way into Ryan Thomas's house on April 13, 2018, by kicking in the back door. Once inside, he took a jewelry box. After the Defendant was apprehended at the scene of this burglary, the authorities discovered he possessed coins and gift cards taken in an April 10, 2018 burglary of the Smiths' house. Ms. Smith identified the coins and gift cards as hers. The Defendant admitted in pretrial statements to the police that he committed both offenses, his trial testimony to the contrary notwithstanding.

The jury had the opportunity to evaluate the Defendant's testimony, as well as that of the State's witnesses. The jury chose to credit the State's proof over the Defendant's claims that he had not committed the offenses and that Detective Van Kirk had testified untruthfully. Viewed in the light most favorable to the State, the evidence supports the Defendant's convictions. He is not entitled to relief.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE